**RYAN G. WELDON**
Assistant U.S. Attorney
U.S. Attorney's Office
P.O. Box 3447
Great Falls, MT   59403
119 First Ave. North, Suite 300
Great Falls, MT   59403
Phone:   (406) 761-7715
FAX:   (406) 453-9973
E-mail:   Ryan.Weldon@usdoj.gov


**ATTORNEY FOR PLAINTIFF**
**UNITED STATES OF AMERICA**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA**
**GREAT FALLS DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br>vs.<br><br>**JOHN WILLIAM LIEBA II,**<br><br>Defendant. | CR 16-51-GF-BMM<br><br><br><br>**TRIAL BRIEF OF THE UNITED STATES** |

1

**ANTICIPATED PROOF**

### A.   John Lieba kidnaps a four-year-old girl.

On February 26, 2016, John William Lieba II (Lieba) was at the park in Wolf Point, Montana. Two girls were playing at the park at the same time, and Lieba began to chase them. The girls ran to their house, and the mother of one of the girls told Lieba to leave their property. The girls ran from Lieba because they were scared he wanted to hurt them.

Within an hour of Lieba chasing the above girls, he grabbed M.L., who was four years old at the time. M.L.'s mother ultimately called 911 and reported that M.L. was missing. While on the phone with 911, M.L.'s mother learned that John Lieba kidnapped her daughter. An agency-wide search for M.L. ensued.

One child saw Lieba kidnap M.L. and run down the street toward the railroad tracks. During the search, law enforcement recovered the shoes of M.L. next to the railroad tracks, which was less than a half mile from where M.L. was last seen.

### B.   Law enforcement arrests Lieba, and he ultimately identifies where M.L. is located.

At approximately noon the following day, law enforcement found Lieba while he was traveling as a passenger in a vehicle in Wolf Point. Lieba was transported to the Roosevelt County Jail. Law enforcement spoke with Lieba, and he said he was not sure about his mental state. When asked if he was distraught, Lieba said

2

he did not know and he felt like he did not care. Lieba claimed he had been prescribed medication, but he stopped taking it. When asked about the source of his pressure or stress, Lieba said he had not been in an intimate relationship with a woman lately. Lieba claimed to have no memory from when he began drinking Friday night, which was February 26, 2016, until he was arrested on Saturday, which was February 27, 2016. When asked what was holding him back from providing further information, Lieba said he was thinking about the girls with whom he had recently become acquainted. Lieba said his romantic opportunities with those girls were now "out the window." According to Lieba, he had no idea where M.L. was at the time of the interview or what happened to her. Agents then asked Lieba if M.L. was dead, and he responded, "Probably."

The following day Lieba requested to again speak with federal agents. He stated that he wanted to "exclude most of what happened the other day. I'll just give you the location." Lieba then provided the general location of where M.L. could be found. Lieba, however, refused to be specific regarding M.L.'s exact location. Lieba was asked if law enforcement should continue to talk with him or leave and assist in locating the body. Lieba replied, "Probably go get the body." Lieba immediately asked if the recorder was still recording. When he realized the recorder was still recording, Lieba became visibly stressed and a tear ran down his

cheek. Lieba stated that M.L. was not dismembered and that she was most likely still alive, but he doubted it. Lieba also stated that M.L. was not tied up.

### C. Law enforcement finds M.L. alive, although she was raped and strangled or suffocated.

The agents found M.L. alive inside an abandoned pickup truck on the backside of the Ag Land Partners business, just west of the CHS grain elevators. The location was in the general location that Lieba identified to agents.

M.L. was immediately taken for medical treatment. Authorities ultimately transported M.L. to the Billings Clinic in Billings, Montana. Dr. Cynthia K. Brewer examined M.L. and found multiple injuries showing trauma to the vagina and anus of M.L. Dr. Brewer has concluded that penetration occurred in M.L.'s vagina and there is suspected penetration of M.L.'s anus. Additional details of Dr. Brewer's testimony were previously filed with the Court. (Doc. 48).

Authorities attempted to interview M.L., but she was unable to discuss much about the incident because she was too shaken. Authorities stopped by to check on M.L. days later. During the visit, M.L. ran to the bathroom to urinate. While attempting to urinate, authorities heard M.L. screaming due to the pain and from the trauma that she suffered in her vaginal area.

### D. The FBI Crime Lab tested the DNA.

The FBI Crime Lab tested the rectal swabs of M.L. The Lab determined

that there was a mixture of male and female DNA.  As a result, the Lab concluded the typing results are 31,000 times more likely if they originated from the defendant and M.L. than if they originated from M.L. and an unrelated unknown individual.  This therefore provides "very strong support" that the defendant is the contributor to the DNA found in M.L.'s rectal swab.

The Lab also tested the chest swab of M.L., which contained a mixture of male and female DNA.  The Lab concluded the typing results are at least 1.1 million times more likely if they originated from the defendant and M.L. than if they originated from M.L. and an unrelated unknown individual.  This therefore provides "extremely strong support" that the defendant is the contributor to the DNA found on the swab of M.L.'s chest swab.

Finally, the Lab tested the hand swabs and penis swabs of the defendant. M.L. is the source of one of the contributors to the DNA foreign to the defendant on the defendant's hand swabs.  The Lab also found a mixture of male and female DNA on the defendant's penis swab.  The Lab concluded that the typing results are at least 53 million times more likely if they originated from M.L. and Lieba than if they originated from an unrelated unknown individual.  This analysis provides "extremely strong support" that M.L. is a contributor to the DNA

obtained from the defendant's penis swabs.[1]

When quantifying the likelihood ratios, the FBI Crime Lab uses the following chart:

| Likelihood Ratios | Qualitative Equivalent |
| --- | --- |
| 1 | Uninformative |
| 2 to 9 | Weak Support |
| 10 to 99 | Moderate Support |
| 100 to 990 | Moderately Strong Support |
| 1,000 to 9,900 | Strong Support |
| 10,000 to 990,000 | Very Strong Support |
| 1 million to 700,000,000,000 | Extremely Strong Support |

### THE PLEA

The United States of America, by and through its counsel, Ryan G. Weldon, notifies the Court and opposing counsel that, though Lieba is proceeding to trial, the United States notes for the record that a motion for change of plea would have

---

[1] The United States previously filed a notice under Fed. R. Evid. 413 outlining an additional rape committed by Lieba. (Doc. 37). Given the level of proof in this case, the United States does not expect to present such evidence at trial. Such a decision will avoid any appellate issues if Lieba is convicted by the jury.

been more beneficial to Lieba than a conviction following trial. Lieba nevertheless proceeds to trial. *See Missouri v. Frye*, 132 S. Ct. 1399 (2012).

### LENGTH OF TRIAL AND NUMBER OF WITNESSES

The United States anticipates calling approximately 16 witnesses. The trial should last no more than three days.

### EXHIBITS

1. Tribal Enrollment Certificate

2. Federal Register

3. Swabs from sexual assault exam

4. Penis and hand swabs of the defendant

5. Audio recordings of the defendant

6. Photographs of the victim

7. Photographs of the scene

8. Comforter

9. Laptop

//

//

//

## LEGAL ISSUES

### A. There is no defense of insanity or diminished capacity available in this case.

Defendants have the ability to assert an insanity defense or a diminished capacity defense under limited circumstances. Congress has specifically addressed the defense of insanity and who carries the burden of proof.

> **(a) Affirmative defense.**—It is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.
>
> **(b) Burden of proof.**—The defendant has the burden of proving the defense of insanity by clear and convincing evidence.

18 U.S.C. § 17. If a defendant intends to assert he was insane at the time of the offense, he must do so "in writing within the time provided for filing a pretrial motion, or at any later time the court sets, and file a copy of the notice with the clerk." Fed. R. Crim. P. 12.2(a). At trial, courts then provide the jury with three options: (1) guilty; (2) not guilty; or, (3) not guilty only by reason of insanity. 18 U.S.C. § 4242(b).[2]

---

2 Prior to the Insanity Defense Reform Act of 1984 ("Insanity Act"), a defendant who mounted a successful insanity defense was simply acquitted. *See Shannon v. United States*, 512 U.S. 573, 575-577 (1994). Congress passed the Insanity Act after John Hinckley attempted to kill President Ronald Regan and was acquitted

Because Lieba has not filed a notice of insanity as required under Fed. R. Crim. P. 12.2(a) by the motions deadline, the defense is prohibited from asserting an insanity defense. *See* Fed. R. Crim. P. 12.2(d)(1).

At trial, a defendant may also claim he is not guilty because he had a diminished capacity, thereby negating proof that he had the requisite intent. *United States v. Twine*, 853 F.2d 676, 679 (9th Cir. 1988). A diminished capacity defense is different than an insanity defense.

> Evidence of a defendant's mental defect at the time that a particular crime was committed is offered during criminal trials for a variety of purposes. It is most commonly employed to establish the insanity defense. This defense is not concerned with the mens rea element of the crime; rather, it operates to completely excuse the defendant whether or not guilt can be proven.
>
> This case presents us with a second use of mental defect evidence—the diminished capacity defense. Unlike insanity, this defense is not an excuse. Diminished capacity is directly concerned with whether the defendant possessed the ability to attain the culpable state of mind which defines the crime. Successful defendants simply are not guilty of the offense charged, although they are usually guilty of a lesser included offense.

*Id.* at 678. Notably, a defendant may raise an insanity defense to any crime,

---

based on an insanity defense. *Id.* A defendant must now proceed through civil commitment if acquitted based on an insanity defense. The statute states that a defendant "shall be committed to a suitable facility until he is eligible for release . . . [because] the person's release would not create a substantial risk of bodily injury to another person or serious damage of property of another due to a present mental disease or defect . . . ." 18 U.S.C. § 4243(a), (e).

including general and specific intent crimes. *See* 18 U.S.C. § 17. But a defendant may only claim a diminished capacity defense to a specific intent crime, not a general intent crime. *Twine*, 853 F.2d at 679 ("This inquiry is necessary because diminished capacity, like voluntary intoxication, generally is only a defense when specific intent is at issue.").

The crimes charged in this case are general intent crimes. *See United States v. Sneezer*, 983 F.2d 920, 922-923 (9th Cir. 1992) (kidnapping is a general intent crime); *United States v. Robertson*, 606 F.3d 943, 954 (8th Cir. 2010) (aggravated sexual abuse is a general intent crime), *overruled on other grounds by United States v. Anderson*, 783 F.3d 727, 740 (8th Cir. 2015); *United States v. McInnis*, 976 F.2d 1226, 1233-1234 (9th Cir. 1992) (assault resulting in serious bodily injury is a general intent crime). Because only general intent crimes are at issue, Lieba cannot argue a diminished capacity defense at trial. *See Twine*, 853 F.2d at 679.

### B. The United States requests that the pictures of the victim be sealed.

At trial, the United States will request that the photographs of the victim be published only to the jury (and not the gallery) and that the exhibits be sealed after admission into evidence.

Under the First Amendment, absent a compelling interest, the public and the

press must have access to court proceedings and associated documents. *Oregonian Publishing Co. v. United States Dist. Ct.*, 920 F.2d 1462, 1465 (1990) (explaining compelling interest can be shown "based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest"). The compelling interest in this case is the privacy of the victim. The United States filed the indictment against Lieba and identified the juvenile victim by initials, rather than providing the full name. It would be incongruous to then file pictures of the injuries of the juvenile victim, including photographs taken by medical personnel, for anyone to view.

Moreover, Congress has already deemed it appropriate to seal proceedings against juvenile delinquents. *See* 18 U.S.C. § 5038 (ensuring records of juvenile delinquents are not disclosed to the public). The juvenile victim should receive similar consideration. The proceedings of the courtroom will remain open to the public, including the testimony and all other evidence. The United States is only requesting that the pictures of the victim remain sealed from public view.

### C. The United States will have child witnesses.

When administering an oath, the rules require the following:

> Before testifying, a witness must give an oath or affirmation to testify truthfully. It must be in a form designed to impress that duty on the witness's conscience.

Fed. R. Evid. 603. The Confrontation Clause demands that any witness testifying against a defendant "give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury." *Maryland v. Craig*, 497 U.S. 836, 845-846 (1990). Importantly, "there is no constitutionally or statutorily required form of oath." *United States v. Ward*, 989 F.2d 1015, 1019 (9th Cir. 1992). The rule is designed to provide courts with flexibility when dealing with "religious adults, atheists, conscientious objectors, mental defectives, and children." *Advisory Committee Notes*, 1972 Proposed Rules, Fed. R. Evid. 603.

When the children take the stand in this case, it is more than acceptable for the Court to administer the oath to ensure that each child is aware of his or her duty to testify truthfully. But no specific oath is required in order to comply with the strictures of Rule 603 other than one that impresses the duty to testify truthfully on the conscience of the witness.

//

//

//

//

//

DATED this 3rd day of April, 2017.

        LEIF JOHNSON
        Acting United States Attorney


        */s/ Ryan G. Weldon*
        RYAN G. WELDON
        Assistant U. S. Attorney

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule, this certifies that the body of the attached trial brief contains 2,365 words, excluding the caption and certificate of compliance.

LEIF JOHNSON
Acting United States Attorney


*/s/ Ryan G. Weldon*
RYAN G. WELDON
Assistant U. S. Attorney